**PPL ENERGYPLUS, LLC, Petitioner,**

v.

**COMMONWEALTH of Pennsylvania,
Respondent.**

Commonwealth Court of Pennsylvania.

Argued May 8, 2002.
Decided June 6, 2002.
Reargument Denied July 3, 2002.

David B. MacGregor, Philadelphia, for petitioner.

Lawrence F. Barth, Harrisburg, for respondent.

BEFORE: FRIEDMAN, Judge, COHN, Judge, and FLAHERTY, Senior Judge.

OPINION BY Judge FRIEDMAN.

PPL Energyplus, LLC (PPL) has filed a petition for review (Petition) in this court's original jurisdiction, seeking to recover from the Commonwealth of Pennsylvania (Commonwealth) the amount that PPL paid as an assessment for the cost of regulating public utilities. PPL also has filed an application for summary relief (Application), which is now before this court for disposition. We deny PPL's application for summary relief.

PPL, a licensed electric generation supplier [1] (EGS), received notices of assessment for the 2000–2001 fiscal year to cover the regulatory expenses of the Pennsylvania Public Utility Commission (PUC), Office of Small Business Advocate (OSBA) and Office of Consumer Advocate (OCA) with respect to public utilities.[2] PPL paid the assessments but filed objections.

The matter was assigned to an administrative law judge (ALJ), and the parties filed a stipulation of facts. (*See* Stipulation, PPL's brief, Tab B.) PPL argued that

PUC, OSBA and OCA could only assess "public utilities" under the relevant statutory provisions and that PPL was *not* a "public utility" but, rather, an EGS. The ALJ agreed, sustaining PPL's objection and ordering PUC, OSBA and OCA to refund the 2000–2001 fiscal year assessment. (*See* ALJ's decision, PPL's brief, Tab C.)

PUC and OCA filed exceptions with PUC's Commissioners. In granting the exceptions, the Commissioners pointed out that, under section 102 of the Public Utility Code (Code),[3] an EGS *is* a "public utility" for the limited purposes described in section 2809 of the Code.[4] The Commissioners concluded that, under section 2809(e) of the Code,[5] PUC has broad discretion to apply any other section of the Code to an EGS, including the section authorizing an assessment to cover the costs of regulating "public utilities." As to PPL's counter argument that the assessment amount was incorrect because PUC calculated it by combining EGS revenues and electric distribution company revenues, the Commissioners simply stated that they addressed this question previously and would not revisit the issue.

## I. "Public Utility"

PPL argues that the Commissioners erred in concluding that PPL is a "public

---

1. Section 2803 of the Public Utility Code, 66 Pa.C.S. § 2803, defines an "electric generation supplier," in pertinent part, as follows:

   A person or corporation ... that sells to end-use customers electricity or related services utilizing the jurisdictional transmission or distribution facilities of an electric distribution company or that purchases, brokers, arranges or markets electricity or related services for sale to end-use customers utilizing the jurisdictional transmission and distribution facilities of an electric distribution company.

2. The assessments were imposed pursuant to section 510 of the Public Utility Code, 66 Pa.C.S. § 510, section 6 of the Small Business Advocate Act, Act of December 21, 1988, P.L. 1871, 73 P.S. § 399.46, and section 904–A.1 of The Administrative Code of 1929, Act of April 9, 1929, P.L. 177, *as amended*, 71 P.S. § 309–4.1.

3. *As amended*, 66 Pa.C.S. § 102.

4. 66 Pa.C.S. § 2809.

5. 66 Pa.C.S. § 2809(e).

utility" under section 102 of the Code. We disagree.

■ Section 102 of the Code defines a "public utility," in pertinent part, as follows:

(1) Any person or corporations now or hereafter owning or operating in this Commonwealth equipment or facilities for:

(i) Producing, generating, transmitting, distributing or furnishing ... electricity ... to or for the public for compensation....

(2) The term does not include....

(vi) Electric generation supplier companies, *except* for the limited purposes as described in sections 2809 (relating to requirements for electric generation suppliers) and 2810 (relating to revenue neutral reconciliation)....

66 Pa.C.S. § 102 (emphasis added). Thus, the Commissioners were correct in stating that EGS companies *are* "public utilities" for the limited purposes described in sections 2809 and 2810 of the Code.

## II. Assessment of EGS Companies

PPL next argues that the Commissioners erred in concluding that an EGS is subject to regulatory assessments. We disagree.

■ Section 2809(e) of the Code provides, in pertinent part, as follows:

(e) **Form of regulation of electric generation suppliers.**—[PUC] may forbear from applying requirements of this part [6] which it determines are unnecessary due to competition among electric generation suppliers. In regulating the service of electric generation suppliers, the [PUC] shall impose requirements necessary to ensure that the present quality of service provided by electric utilities does not deteriorate....

66 Pa.C.S. § 2809(e). The "limited purpose" described in section 2809 of the Code is to ensure the present quality of the service provided by electric utilities. To that end, PUC has discretion to apply the requirements of the Code to EGS companies.

Here, PUC decided to apply section 510 of the Code, 66 Pa.C.S. § 510, to EGS companies. The intent of this section is set forth in subsection (f).

(f) **Intent of section.**—It is the intent and purpose of this section that *each public utility subject to this part* [i.e., the Code] shall advance to [PUC] its reasonable share of the cost of administering this part....

66 Pa.C.S. § 510(f) (emphasis added). As indicated above, EGS companies *are* "public utilities" for the limited purposes described in sections 2809 and 2810 of the Code. Thus, EGS companies are public utilities "subject to [the Code]." *Id.* This means that PUC did not err by assessing PPL under section 510 of the Code.

## III. Assessment Calculation

Finally, PPL argues that PUC erred in grouping electric generation suppliers with electric distribution companies to calculate a single assessment rate. We disagree.

### A. Section 510(b)

Section 510(b) of the Code, 66 Pa.C.S. § 510(b), explains how PUC is to allocate the assessment to the various public utilities. Section 510(b) provides, in pertinent part, as follows:

(1) [PUC] shall determine for the preceding calendar year *the amount of its expenditures directly attributable to the regulation of each group of utilities furnishing the same kind of service,* and debit the amount so determined to such group....

─────────────

**6.** The words "this part" refer to Part I of Title 66, which is the "Public Utility Code."

(2) [PUC] shall also determine for the preceding calendar year the *balance* of its expenditures, not debited as aforesaid, and allocate such balance to each group in the proportion which the gross intrastate operating revenues of such group for that year bear to the gross intrastate operating revenues of all groups for that year.

(3) [PUC] shall then *allocate the total assessment prescribed by subsection (a) to each group* in the proportion which the sum of the debits made to it bears to the sum of the debits made to all groups.

(4) *Each public utility within a group shall then be assessed* for and shall pay to [PUC] such proportion of the amount allocated to its group as the gross intrastate operating revenues of the public utility for the preceding calendar year bear to the total gross intrastate operating revenues of its group for that year.

66 Pa.C.S. § 510(b) (emphasis added). In other words, the process involves the grouping of public utilities furnishing the same kind of service. PUC grouped the EGS companies and electric distribution companies together under subsection (1).

PPL contends that PUC erred in grouping the EGS companies with electric distribution companies because the two do not furnish the same kind of service. PPL asserts that the electric distribution companies provide an electric "wires" distribution service, but the EGS companies provide an electric generation supply service. (PPL's brief at 42–43.) In other words, one provides the wire over which the electricity flows, and the other provides the electricity itself.

■ However, it seems to us that the EGS companies provide the "same kind of

service" as the electric distribution companies, i.e., *electric* service as opposed to telephone service, natural gas service, or water/sewage services. Thus, PUC did not violate section 510(b) of the Code by grouping the two entities for purposes of the assessment.

### B. 52 Pa.Code § 54.38

■ PPL also argues that the grouping of EGS companies and electric distribution companies violates the regulation at 52 Pa.Code § 54.38,[7] which governs the assessments for licensed EGS companies. However, assuming that PPL is correct that 52 Pa.Code § 54.38 prohibits the grouping of EGS companies and electric distribution companies for purposes of assessment, then the regulation conflicts with its enabling statute. Indeed, as stated above, the assessment process set forth in section 510(b) of the Code requires the grouping of EGS companies and electric distribution companies because both furnish electric service. To the degree that 52 Pa.Code § 54.38 can be construed as contrary to the statute, the regulation is invalid. *Public School Employees' Retirement System v. Pennsylvania School Boards Association, Inc.*, 545 Pa. 597, 682 A.2d 291 (1996).

Accordingly, PPL's application for summary relief is denied.

### *ORDER*

AND NOW, this 6th day of June, 2002, the application for summary relief filed by PPL Energyplus, LLC, is hereby denied.

---

7. The regulation at 52 Pa.Code § 54.38 (emphasis added) states:
   (a) A licensee shall be required to pay assessments to be used to defray regulatory costs. See section 510 of the code (relating to assessment for regulatory expenses upon public utilities). Assessments will be *based upon the administrative costs incurred by [PUC] related to generation suppliers* ....