870 A.2d 901

**DELMARVA POWER & LIGHT COMPANY,
t/a Conectiv Energy, Appellant**

**v.**

**COMMONWEALTH of Pennsylvania and Pennsylvania
Public Utility Commission, Appellees.**

**PPL Energyplus, LLC, Appellant**

**v.**

**Commonwealth of Pennsylvania, Appellee.**

Supreme Court of Pennsylvania.

Argued May 11, 2004.

Decided March 31, 2005.

---

**2.**  On two occasions, Appellant left the office unaccompanied to use a restroom.

Craig Allen Doll, Harrisburg, for Delmarva Power & Light Co.

Jesse Andrew Dillon, Allentown, John H. Isom, Harrisburg, David Bruce MacGregor, Philadelphia, for PPL Energyplus, LLC.

D. Michael Fisher, Pittsburgh, for the Com. of PA, appellee.

Patricia Krise Burket, Lawrence F. Barth, Elizabeth A. Lion Januzzi, Bohdan R. Pankiw, Robert James Longwell, Harrisburg, for Com. and PUC. appellees.

Christine Maloni Hoover, Irwin Allen Popowsky, Harrisburg, for Office of Consumer Advocate, appellee amicus curiae.

Before: CAPPY, C.J., CASTILLE, NIGRO, NEWMAN, SAYLOR, EAKIN and BAER, JJ.

## *OPINION*

Justice NIGRO.

At issue in this appeal is whether the Pennsylvania Public Utility Commission's Fiscal Office (the "Fiscal Office") may assess electric generation suppliers ("EGSs") for the administrative expenses of the Public Utility Commission (the "Commission"), the Office of Consumer Advocate ("OCA"), and the Office of Small Business Advocate ("OSBA").[1] We hold that the Fiscal Office may not assess EGSs for such expenses.

Appellants Delmarva Power & Light Company, t/a Conectiv Energy ("Conectiv"), and PPL Energyplus, LLC ("PPL") are licensed by the Commission to act as EGSs pursuant to section 2809(b) of the Public Utility Code (the "Code"),[2] 66 Pa.C.S. § 2809(b).[3] As EGSs, Conectiv and PPL either (1)

---

**1.** While the Commission as a whole has the power to make assessments, the Fiscal Office is the department of the Commission that actually makes such assessments on behalf of the Commission. Thus, we refer to the Fiscal Office here rather than the Commission as a whole.

**2.** Act of July 1, 1978, P.L. 598, No. 116 (codified at 66 Pa.C.S. §§ 101–3316).

**3.** Section 2809(b) of the Code provides that a person or corporation wishing to serve as an EGS must apply to the Commission for an EGS

sell electricity or related services to retail electric customers, or (2) purchase, broker, arrange, or market electricity or related services to retail electric customers.[4] *See* 66 Pa.C.S. § 2803. In August 2000, the Fiscal Office sent both Conectiv and PPL three notices of assessment and invoices. In the first notice and invoice, the Fiscal Office assessed Conectiv and PPL for a portion of the Commission's administrative expenses during the fiscal year beginning on July 1, 2000 and ending on June 30, 2001 (the "2000 Fiscal Year"). The Fiscal Office indicated that it was imposing the assessment pursuant to section 510 of the Code, which is entitled "Assessment for regulatory expenses upon public utilities" and grants the Fiscal Office the authority to assess "public utilities" for an allocated share of the Commission's costs in administering the Code.[5] *See* 66 Pa.C.S. § 510.

The second notice and invoice assessed Conectiv and PPL for a portion of the OCA's administrative costs during the 2000 Fiscal Year. The Fiscal Office made this assessment based on section 904–A.1 of the Administrative Code,[6] which

license. *See* 66 Pa.C.S. § 2809(b). The section then authorizes the Commission to issue EGS licenses under the following circumstances:

A license shall be issued to any qualified applicant, authorizing the whole or any part of the service covered by the application, if it is found that the applicant is fit, willing and able to perform properly the service proposed and to conform to the provisions of this title and the lawful orders and regulations of the commission under this title, including the commission's regulations regarding standards and billing practices, and that the proposed service, to the extent authorized by the license, will be consistent with the public interest and the policy declared in this chapter; otherwise, such application shall be denied.

*Id.*

4. EGSs use the jurisdictional transmission or distribution facilities of an electric distribution company in providing the above services. *See* 66 Pa.C.S. § 2803. Electric distribution companies are essentially public utilities that provide facilities for the jurisdictional transmission and distribution of electricity to retail electric customers. *See id.*

5. According to section 510, the Fiscal Office shall calculate the amount owed by each public utility based on the utility's yearly intrastate operating revenues and the Commission's yearly expenses. *See* 66 Pa.C.S. § 510.

6. Act of April 9, 1929, P.L. 177 (71 P.S. §§ 51–732).

authorizes the Fiscal Office to assess "public utilities" for a reasonable share of the expenses incurred by the OCA in administering the Administrative Code. *See* 71 P.S. § 309–4.1. The last notice and invoice assessed Conectiv and PPL for a share of the OSBA's administrative costs during the 2000 Fiscal Year. The Fiscal Office made this assessment based on section 399.46 of the Small Business Advocate Act,[7] which grants the Fiscal Office the authority to assess "public utilities" for their reasonable share of the expenses incurred by the OSBA in administering the Small Business Act.[8] *See* 73 P.S. § 399.46.

In September 2000, Conectiv and PPL paid the assessments owed by them according to the above invoices, but also filed objections with the Commission in which they argued that the assessments were erroneous.[9] According to Conectiv and PPL, the Fiscal Office did not have the authority to assess them pursuant to section 510 of the Code because that section merely grants the Fiscal Office the authority to assess "public utilities," and EGSs such as Conectiv and PPL are not public utilities. Likewise, Conectiv and PPL argued that the Fiscal Office could not assess them for the OCA's and the OSBA's administrative expenses because section 904–A.1 of the Administrative Code and section 399.46 of the Small Business Advocate Act only permit the Fiscal Office to assess "public utilities." *See* 71 P.S. § 309–4.1, 73 P.S. § 399.46.

In support of their contention that they are not public utilities, Conectiv and PPL pointed to section 102 of the Code, which defines public utilities as follows:

7. Act of December 21, 1988, P.L. 1871, No. 181 (73 P.S. §§ 399.41–399.50).

8. Section 904–A.1 of the Administrative Code and section 399.46 of the Small Business Advocate Act direct that the amounts owed by each public utility be calculated in a manner very similar to that provided by section 510 of the Code. *Compare* 71 P.S. § 309–4.1 and 73 P.S. § 399.45, *with* 66 Pa.C.S. § 510.

9. The same provisions that permit the Fiscal Office to assess public utilities also provide that public utilities may protest such assessments with the Commission. *See* 66 Pa.C.S. § 510(c); 71 P.S. § 309–4.1(c); 73 P.S. § 399.46(c).

(1) Any person or corporations now or hereafter owning or operating in this Commonwealth equipment or facilities for: (i) Producing, generating, transmitting, distributing or furnishing natural or artificial gas, electricity, or steam for the production of light, heat, or power to or for the public for compensation.

. . . .

(2) *The term does not include:*

. . . .

(vi) *Electric generation supplier companies, except for the limited purposes as described in sections 2809 (relating to requirements for electric generation suppliers) and 2810 (relating to revenue neutral reconciliation).*

66 Pa.C.S. § 102 (emphasis added).

The Fiscal Office filed an answer to Conectiv's and PPL's objections, and the OCA and the OSBA filed notices of intervention. The Fiscal Office argued that it had the power to assess EGSs such as Conectiv and PPL because section 102 does not completely exclude EGSs from being characterized as public utilities, but rather allows EGSs to be characterized as public utilities for purposes of sections 2809 and 2810 of the Code. *See id.* Thus, the Fiscal Office argued that it could assess EGSs based on section 2809(e) of the Code,[10] which states as follows:

(e) Form of regulation of electric generation suppliers.— *The commission may forbear from applying requirements of this part [i.e., the Code] which it determines are unnecessary due to competition among electric generation suppliers.* In regulating the service of electric generation suppliers, the commission shall impose requirements necessary to ensure that the present quality of service provided by electric utilities does not deteriorate, including assuring that adequate reserve margins of electric supply are maintained

10. Notably, the Fiscal Office did not argue that it could apply section 510 assessments to EGSs pursuant to any other provision in sections 2809 and 2810. Indeed, all of the parties appear to agree that section 2809(e) is the only provision that would permit the Fiscal Office to impose section 510 assessments on EGSs.

and assuring that 52 Pa.Code Ch. 56 (relating to standards and billing practices for residential utility service) are maintained.

66 Pa.C.S. § 2809(e) (emphasis added).[11] According to the Fiscal Office, the forbearance language in the first sentence of section 2809(e) gave it the discretion to apply any provision of the Code, including section 510, to EGSs when it determined that such an application was necessary notwithstanding competition among EGSs.

On February 27, 2001, Conectiv's and PPL's objections were consolidated before Administrative Law Judge Morris J. Solomon.[12] On the same date, Conectiv and PPL each submitted a stipulation of facts, which they had respectively entered into with the Fiscal Office. Based on these stipulations, the parties agreed that an evidentiary hearing concerning the matter was unnecessary.

On April 30, 2001, Judge Solomon issued an initial decision and order sustaining Conectiv's and PPL's objections and directing the Fiscal Office to refund the assessments paid by Conectiv and PPL in connection with the three notices and invoices received by each company. Judge Solomon determined that the assessments at issue were a type of tax, and as a result, section 510 had to be strictly construed.[13] *See* Judge Solomon's Decision, 4/30/2001, at 6 (citing to *Commonwealth v. Allied Building Credits*, 385 Pa. 370, 123 A.2d 686, 690–91 (1956), and other cases for proposition that taxing statute

11. There is no dispute that the language "this part" in section 2809(e) refers to the Code as the Code encompasses Part I of Title 66.

12. Conectiv's and PPL's objections were also consolidated with objections filed by another EGS, namely, PECO Energy Company, t/a Exelon Energy ("Exelon"). Like Conectiv and PPL, Exelon received Notices of Assessment and invoices from the Fiscal Office.

13. Notably, neither Judge Solomon nor the courts below examined section 904–A.1 of the Administrative Code or section 399.46 of the Small Business Advocate Act, *i.e.*, the statutes giving the Fiscal Office the authority to assess public utilities for the OCA's and the OSBA's administrative expenses. Both Judge Solomon and the lower courts seemed to assume that if EGSs may be considered public utilities for purposes of section 510, they may also be deemed public utilities for purposes of section 904–A.1 of the Administrative Code or section 399.46 of the Small Business Advocate Act.

must be strictly construed and may not be extended by implication). Judge Solomon further agreed with Conectiv and PPL that the plain language of section 510 only permits the Fiscal Office to impose assessments on "public utilities," and EGSs, in general, are not public utilities.[14] While Judge Solomon acknowledged that section 102 permitted EGSs to be considered public utilities for purposes of sections 2809 and 2810, he found it significant that section 102 did not also state that EGSs could be considered public utilities for purposes of section 510.[15] Moreover, with respect to sections 2809 and 2810, Judge Solomon highlighted the fact that none of the provisions in those sections, particularly subsections 2809(c)(1)(ii) and (iv), which described the financial responsibilities of EGSs, mentioned section 510. *See* 66 Pa.C.S. § 2809(c). Regarding the Fiscal Office's argument that the forbearance language in the first sentence of section 2809(e) gave it the power to assess EGSs, Judge Solomon noted that this was a "strained reverse inference" as the authority to forbear is simply "the power to refrain from exercising an existing authority; it is not the granting of that authority." Judge Solomon's Decision, at 5. In sum, Judge Solomon explained that he could not find any "plain and unmistakable taxing language as to [EGSs]" in the Code and he refused to imply that the Fiscal Office had the power to tax EGSs in the absence of direct language to that effect. *Id.* at 8. He therefore concluded that "the assessment process applicable to a public utility does not apply to an EGS." *Id.*

The Fiscal Office and the OCA filed exceptions to Judge Solomon's initial decision, which the Commission granted on September 7, 2001.[16] The Commission initially determined

**14.** Judge Solomon explained that EGSs were distinct from public utilities because EGSs had to obtain a license to operate, rather than a certificate of public convenience, which was the condition precedent for public utilities to operate.

**15.** Judge Solomon also found it significant that the General Assembly had not added any language to section 510 to indicate that the section was meant to apply to EGSs as well as public utilities.

**16.** PPL also filed exceptions to a second issue decided by Judge Solomon that is not at issue here. Thus, we need not consider PPL's exceptions.

that Judge Solomon's finding that the section 510 assessment was a tax was erroneous because the assessment had all of the characteristics of a license fee as opposed to a tax.[17] Thus, the Commission concluded that section 510 did not have to be strictly construed as a taxing statute.

Recognizing that section 510 nevertheless only permitted the Fiscal Office to assess "public utilities," the Commission turned to the definition of public utilities in section 102 and noted that EGSs could be public utilities for purposes of sections 2809 and 2810. The Commission then looked at section 2809(e) and, unlike Judge Solomon, was persuaded by the Fiscal Office's argument that the forbearance language in that section gave the Fiscal Office the power to apply section 510 assessments to EGSs. While recognizing that the language was "a bit awkward," the Commission nonetheless found that the General Assembly's intent was clear. Comm'n Opinion and Order, 9/7/2001, at 15. As it explained, "[b]y granting the [Fiscal Office] the power to 'forbear from applying the requirements of this part which it deems are unnecessary due to competition among [EGSs],' the [General Assembly] grants the [Fiscal Office] broad discretion to determine what, if any, other section of the Code is to be enforced relative to EGSs, notwithstanding the existence of competition among EGSs." *Id.* (quoting 66 Pa.C.S. § 2810). Thus, the Commission concluded that the Fiscal Office had acted properly in applying section 510 to Conectiv and PPL based on the office's finding that section 510 was a necessary provision of the Code to apply to EGSs in spite of the competition they faced.

Commissioner Terrance Fitzpatrick dissented from the Commission's decision. While he agreed with the Commission

---

**17.** Citing to *City of Phila. v. Southeastern Pennsylvania Transp. Auth.*, 8 Pa.Cmwlth. 280, 303 A.2d 247, 252 (1973), the Commission explained that taxes are revenue-producing measures imposed on all citizens pursuant to the government's taxing power whereas license fees are merely fees paid by a type of business or occupation to the agency that supervises and regulates that type of business or occupation. Thus, as the Fiscal Office imposed the section 510 assessment only upon public utilities and solely to offset the Fiscal Office's costs for regulating those utilities, the Commission concluded that the assessment was undoubtedly a license fee.

majority that EGSs could be considered public utilities for purposes of sections 2809 and 2810, he parted ways with the majority's reading of section 2809(e). According to Commissioner Fitzpatrick, the second sentence of section 2809(e), rather than the forbearance language in the first sentence, outlined the Fiscal Office's authority to regulate EGSs.[18] Citing to that second sentence, Commissioner Fitzpatrick found that the Fiscal Office could only regulate EGSs as public utilities by applying those Code provisions that were "necessary to ensure that the present quality of service provided by electric utilities does not deteriorate." Commissioner Fitzpatrick's Dissent, 9/7/2001, at 1 (*quoting* 66 Pa.C.S. § 2809(e)). Therefore, as Commissioner Fitzpatrick found that "levying assessments against EGSs is not necessary to maintain the quality of service formerly provided by public utilities," he concluded that the Fiscal Office did not have the authority to impose section 510 assessments on EGSs under the Code. *Id.*

Following the Commission's decision, PPL and Conectiv filed petitions for review of the Commission's decision with the Commonwealth Court.[19] PPL also filed an application for summary relief. On June 6, 2002, the Commonwealth Court denied PPL's application. *See PPL Energyplus, LLC v. Commonwealth,* 800 A.2d 360 (Pa.Commw.2002) (*"PPL Energyplus I"*). The Commonwealth Court, like all of the tribunals before it, found that EGSs could be considered public utilities for the limited purposes of sections 2809 and 2810. The court then agreed with Commissioner Fitzpatrick that the second sentence of section 2809(e), rather than the first sentence, outlined the Fiscal Office's regulation powers with respect to EGSs. However, contrary to Commissioner Fitzpatrick, the court concluded that the Fiscal Office could impose section 510

18. In reaching this conclusion, Commissioner Fitzpatrick noted that he had an understanding of the General Assembly's intent in enacting section 2809 because he participated in the drafting of chapter 28 of the Code, which is the chapter specifically regarding EGSs.

19. Exelon, which had been acting in accordance with PPL and Conectiv up until this point, *see supra* n. 12, also filed a petition for review. However, based on a joint motion by all of the parties, Exelon's petition is being held in abeyance pending the outcome of our decision.

assessments on EGSs based on the Commission's determination that such assessments were "necessary to ensure that the present quality of the service provided by electric utilities does not deteriorate." *See id.* at 362 (quoting 66 Pa.C.S. § 2809(e)).

Having prevailed in *PPL Energyplus I,* the Fiscal Office filed an application for summary relief with the Commonwealth Court with respect to Conectiv's and PPL's petitions for review. On January 10, 2003, the Commonwealth Court entered a decision granting the Fiscal Office's application. *See PPL Energyplus, LLC v. Commonwealth,* 814 A.2d 861 (Pa.Commw.2003) (*"PPL Energyplus II"*). The Commonwealth Court noted that *PPL Energyplus I* had resolved all but one of Conectiv's and PPL's claims and thus, the only question remaining was whether the General Assembly unconstitutionally granted the Fiscal Office unfettered discretion to apply provisions of the Code to EGSs. Turning to that question, the court concluded that the General Assembly had not granted the Fiscal Office unfettered discretion because the Code made clear that the Fiscal Office could "impose the Code's requirements upon EGS companies only when such requirements are necessary to maintain the quality of service, to protect the public or to ensure the safety and reliability of electric service." *PPL Energyplus II,* 814 A.2d at 865. Moreover, the court pointed out that "[w]hen the [Fiscal Office] decides to impose additional Code requirements upon EGS companies, the [Fiscal Office] must be prepared to defend its action in light of [the above] standards." *Id.* Thus, the court found none of Conectiv's and PPL's claims to be meritorious and entered judgment in favor of the Fiscal Office.

In their appeals to this Court, Conectiv and PPL assert first and foremost, as they did below, that the Fiscal Office does not have the authority to assess them pursuant to section 510 because they are not public utilities for purposes of section 510. They point out that as a general rule, EGSs are not public utilities because they do not own or operate equipment or facilities for "[p]roducing, generating, transmitting, distributing or furnishing ... electricity." 66 P.S. § 102. Indeed,

they note that the General Assembly has generally excluded EGSs from the definition of public utilities. *See id.* While Conectiv and PPL acknowledge that the General Assembly has made an exception to this general rule by permitting EGSs to be considered public utilities "for the limited purposes" of sections 2809 and 2810, *id.,* they emphasize that the General Assembly did not explicitly include section 510 in this exception although it clearly could have done so. *See* PPL's Bf., at 25 ("The General Assembly, if it intended for EGSs to be subject to regulatory assessments, simply could have added a third exception for assessments."); Conectiv's Bf., at 24–25 ("Significantly, no mention of the applicability of Section 510 is made in [Section 102] despite an opportunity to do so."). Thus, they contend that "the General Assembly did not intend for EGSs to be subject to assessments." PPL's Bf., at 25–26.

Conectiv and PPL also argue that sections 2809 and 2810 do not permit the Fiscal Office to apply section 510 assessments to public utilities. They emphasize that neither section 2809, which sets forth the requirements for EGSs, nor section 2810, which provides a mechanism to stabilize the tax revenues obtained from public utilities and EGSs, includes any reference to section 510 or assessments. Furthermore, Conectiv and PPL assert that the Fiscal Office's contention that the forbearance language in section 2809(e) grants it the power to apply any provision of the Code, including section 510, to EGSs is nonsensical because such language merely grants the Fiscal Office the authority to decline to apply provisions of the Code to EGSs where those provisions have already been deemed to apply to EGSs, and thus, does not grant the Fiscal Office unfettered authority to apply any provision of the Code to EGSs. *See* PPL's Bf., at 36 ("In order to 'forbear' from applying a requirement, the requirement must first apply."); *id.* ("Section 2809(e) simply states that, to the extent that the Commission has regulatory jurisdiction over EGSs, the Commission has the authority to 'forbear from applying such requirements.'"). Conectiv and PPL also contend that the Fiscal Office's interpretation of the forbearance language directly contradicts the General Assembly's attempt to deregu-

late EGSs except for "the limited purposes" of sections 2809 and 2810.[20] *See id.* at 35 ("The General Assembly described the exception to the exclusion of EGSs from public utility regulation as being for 'limited purposes.' Subjecting EGSs to the possibility of full blown, pervasive utility regulation cannot rationally be described as 'limited.' "); Conectiv's Bf., at 26 ("[T]he sweeping language of section 2809, rather than provide an exception to the general rule of regulatory prohibition as to an EGS, provides the [Fiscal Office] with sweeping powers to regulate, leaving it to the discretion of the [Fiscal Office] to determine when it shall forebear from such regulation. The exception has thus swallowed the rule."). Moreover, Conectiv and PPL argue that if section 2809(e) is read pursuant to the Fiscal Office's interpretation, it unconstitutionally delegates to the Commission unfettered authority to regulate EGSs.

Significantly, PPL accepts the Commonwealth Court's conclusion that the second sentence of section 2809(e), rather than the forbearance language in the first sentence, defines the Fiscal Office's authority to regulate EGSs, and admits that based on that second sentence, the Fiscal Office may "impose requirements [on EGSs that are] necessary to ensure that the present quality of service provided by electric utilities does not deteriorate, including assuring that adequate reserve margins are maintained and assuring that 52 Pa.Code Ch. 56 (relating to standards and billing practices for residential utility service) are maintained." [21] *See* 66 Pa.C.S. § 2809(e). Nonetheless, according to PPL, the Commonwealth Court erred in

20. Conectiv and PPL additionally asserts that the Fiscal Office's interpretation of section 2809(e) is contrary to the purpose of the Electric Competition Act, Act of December 3, 1996, P.L. 802, No. 138 (codified at 66 Pa.C.S. §§ 2801–12), which is to promote a competitive retail electric generation market for the benefit of consumers. *See* 66 Pa.C.S. § 2810(a); Senate Legislative Journal, 2675 (Nov. 25, 1996) (statement of Sen. Afflerbach).

21. Unlike PPL, Conectiv does not accept the Commonwealth Court's conclusion that the second sentence of section 2809(e) defines the Fiscal Office's authority to regulate EGSs. Rather, Conectiv summarily argues that the Commonwealth Court's order unconstitutionally delegates the Commission unfettered authority to regulate EGSs. As we reverse the Commonwealth Court's order on other grounds, we need not address this argument. *See infra* n. 26.

finding that the Fiscal Office can impose section 510 assessments on EGSs pursuant to this provision because those assessments "are unrelated to reliability of service or standards and billing practices for residential services of EGSs." PPL's Bf., at 39. We agree with PPL in this respect.

■ An appellate court may only reverse an order of the Commission where: (1) the order violates the appellant's constitutional rights; (2) the Commission failed to follow the proper procedures in entering the order; (3) the Commission's findings of fact are not supported by substantial evidence; or (4) the Commission made an error of law. *See* 2 Pa.C.S. § 704; *Elite Industries v. Public Utility Comm'n*, 574 Pa. 476, 832 A.2d 428, 431 (2003). Our goal in interpreting statutes is to ascertain and effectuate the General Assembly's intent. *See* 1 Pa.C.S. § 1921(a); *Elite Industries*, 832 A.2d at 431. Moreover, it is a well established principle of statutory construction that when "the language of [a] statute is clear and unambiguous, a court need go no further to discern the legislature's intent." *Elite*, 832 A.2d at 431; 1 Pa.C.S. § 1921(b) ("When the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit."). "It is only when the words of [a] statute are not explicit that the intention of the legislature may be ascertained by considering other means of statutory interpretation and construction." *Barasch v. Public Utility Comm'n*, 516 Pa. 142, 532 A.2d 325, 332 (1987), *aff'd*, 488 U.S. 299, 109 S.Ct. 609, 102 L.Ed.2d 646 (1989); *see also* 1 Pa.C.S. § 1921(c).

■ The issue in this case is clearly one of statutory interpretation. Thus, we must determine and effectuate the General Assembly's intention in enacting the statutes at issue.[22] As all of the parties agree, the plain language of section

22. Notably, Conectiv and PPL do not contest the Commission's finding that the assessments at issue were not a type of tax and that, as a result, the statutory provisions at issue did not have to be strictly construed. Thus, we shall not disturb that finding and will construe the statutes liberally. Nevertheless, we point out that the plain language of the

510 of the Code, section 904–A.1 of the Administrative Code, and section 399.46 of the Small Business Advocate Act only give the Fiscal Office the authority to assess "public utilities." *See* 66 Pa.C.S. § 502, 71 P.S. § 309–4.1, 73 P.S. § 399.46. Consequently, the Fiscal Office may only assess EGSs such as Conectiv and PPL if they are "public utilities."

Fortunately, the General Assembly has defined the term "public utility" for purposes of the Code and that definition also applies to the Administrative Code and the Small Business Advocate Act. *See* 66 Pa.C.S. § 102 (defining term "public utility" for purposes of Code); 71 P.S. § 309–1 (defining term "public utility" for purposes of Administrative Code by referring to definition provided by repealed version of Code); 1 Pa.C.S. § 1937 (a reference to a repealed statute shall be interpreted as referring to new statute replacing repealed statute unless statute indicates otherwise); 73 P.S. § 399.42 (defining term "public utility" for purposes of Small Business Advocate Act by referring to definition provided by 66 Pa.C.S. § 102). We will therefore look primarily to that definition to determine whether the General Assembly intended EGSs to be deemed public utilities. *See* 1 Pa.C.S. § 1903 (technical words defined by General Assembly "shall be construed according to such peculiar and appropriate meaning or definition"); *Commonwealth v. Lobiondo*, 501 Pa. 599, 462 A.2d 662, 664 (1983) (if statute contains its own definitions, words in statute shall be given the meaning provided by such definitions).

The Code's definition of "public utility" states plainly and clearly that "[t]he term *does not include* ... (vi) [*EGSs*], except for the limited purposes as described in sections 2809 (relating to requirements for electric generation suppliers) and 2810 (relating to revenue neutral reconciliation)." 66 Pa.C.S. § 102 (emphasis added). Based on this unambiguous language, it is clear that the General Assembly did not intend for EGSs to be characterized as public utilities for most purposes. *See, e.g., Bethlehem Steel Corp. v. Public Utility Comm'n*, 552

statutes at issue here mandates the same resolution under either a strict or liberal construction.

Pa. 134, 713 A.2d 1110, 1112 (1998); *Independent Oil and Gas Assoc. v. Public Utility Comm'n,* 789 A.2d 851, 855 (Pa. Commw.2002). Nevertheless, the General Assembly made an exception to this rule by permitting EGSs to be deemed public utilities for *"the limited purposes"* described in sections 2809 and 2810. *See* 66 Pa.C.S. § 102 (emphasis added). Notably, in making this limited exception, the General Assembly did not also state that EGSs could be deemed public utilities for purposes of section 510. Given this omission, we must presume that the General Assembly did not intend for EGSs to be considered public utilities for purposes of section 510 assessments. *See* 1 Pa.C.S. § 1924 ("Exceptions expressed in a statute shall be construed to exclude all others."); *Kmonk–Sullivan v. State Farm Mut. Auto. Ins. Co.,* 567 Pa. 514, 788 A.2d 955, 962 (2001) ("An exception expressly provided in a statute is a strong indication that the legislature did not intend to exclude unexpressed items.").

The Fiscal Office argues, however, that the General Assembly actually authorized it to apply section 510 assessments to EGSs as public utilities based on language in subsection 2809(e). While we agree with the Fiscal Office that it may treat EGSs as public utilities for "the limited purposes" described in subsection 2809(e), 66 Pa.C.S. § 102, we disagree that subsection 2809(e) grants the Fiscal Office the power to treat EGSs as public utilities for purposes of section 510 assessments.[23] In the first instance, we cannot agree with the Fiscal Office's ongoing contention that the forbearance language in the first sentence of section 2809(e) authorizes it to assess EGSs. To "forbear" means to refrain "from doing *something that one has a legal right to do."* Black's Law

---

**23.** The Fiscal Office also contends that we have to defer to its interpretations of the statutes at issue because it is in charge of administering those statutes. However, although we give deference to an agency's interpretation of a statute that it is directly involved in administering when the statute's language is not explicit, we need not give such deference when the words of a statute are plain and unambiguous as they are here. *See* 1 Pa.C.S. § 1921(b). Moreover, where an agency's interpretation is clearly erroneous, we will not defer to that interpretation. *See Peoples Natural Gas Co. v. Pennsylvania Public Utility Comm'n,* 523 Pa. 370, 567 A.2d 642, 644 (1989).

Dictionary 644 (6th ed. 1990) (emphasis added). Therefore, this term only grants an entity the power to decline to exert powers that it already *"has* the legal right to do;" the term in no way grants an entity the authority to exert powers that it *does not have* the "legal right to do." *See id.* (emphasis added). Applying this definition to the word forbear in the first sentence of section 2809(e) reveals that the sentence simply grants the Fiscal Office the authority to refrain from applying those requirements of the Code that it already has the authority to apply to EGSs when such requirements are unnecessary due to competition amongst EGSs. *See* 66 Pa.C.S. § 2809(e) ("The commission may forbear from applying requirements of this part which it determines are unnecessary due to competition among [EGSs]."); *see also* 1 Pa.C.S. § 1903 ("Words and phrases shall be construed according to rules of grammar and according to their common and approved usage."). Consequently, the Fiscal Office may only "forbear" from applying section 510 assessments to EGSs according to this sentence if it has the legal authority to apply such assessments to EGSs in the first place.

In determining what sections of the Code the Fiscal Office has the legal authority to apply to EGSs, we agree with the Commonwealth Court below that we must look at the second sentence of section 2809(e) as that sentence plays off of the previous sentence by outlining those sections of the Code that may legally apply to EGSs as public utilities. According to that second sentence, the Fiscal Office may only impose on EGSs "those requirements necessary to ensure that the present quality of service provided by electric utilities does not deteriorate, including assuring that adequate reserve margins are maintained and assuring that 52 Pa.Code Ch. 56 (relating to standards and billing practices for residential utility service) are maintained." 66 Pa.C.S. § 2809(e). Significantly, the Fiscal Office does not argue that it may assess EGSs pursuant to this sentence and as a result, it also does not claim or otherwise attempt to show that section 510 assessments are necessary to ensure the present quality of electric utility service. Given the absence of such a showing, we cannot find

that section 510 assessments, which simply fund the administrative practices of the Commission, are necessary to maintain current standards of electric service.[24] Furthermore, we note that these assessments have nothing to do with maintaining reserve margins or adequate billing practices. Therefore, contrary to the finding of the Commonwealth Court, we hold that the Fiscal Office does not have the legal authority to assess EGSs as public utilities for the Commission's administrative costs pursuant to section 510 of the Code.[25]

We likewise hold that the Fiscal Office does not have the legal authority to assess EGSs as public utilities for the OCA's and the OSBA's administrative costs pursuant to section 904–A.1 of the Administrative Code and section 399.46 of the Small Business Advocate Act. As noted above, these sections only grant the Fiscal Office the authority to assess "public utilities." *See* 71 P.S. § 309–4.1, 73 P.S. § 399.46. Moreover, the term "public utilities" is defined for purposes of these sections as it is defined in section 102 of the Code. *See* 71 P.S. § 309–1; 73 P.S. § 399.42. Thus, as EGSs may only be considered public

**24.** We note that at first blush, it may seem arguable that section 510 assessments are necessary to maintain high quality electric service because such assessments fund the Commission and the Commission is needed to keep electric utilities up to present standards. However, this argument is actually unpersuasive because the Fiscal Office concedes that the Commission will continue to regulate electric utilities so that they maintain the current standards of service even if it cannot collect section 510 assessments from EGSs. *See* The Fiscal Office's Bf., at 3 ("If the EGSs' share of the annual assessment is not paid by PPL and the other EGSs, that portion will be paid by other regulated companies.").

**25.** We note that the Commission has adopted a regulation that states that EGSs shall be required to pay assessments to the Fiscal Office pursuant to section 510 and PPL and Conectiv have not explicitly attacked the validity of that regulation. *See* 52 Pa.Code § 54.38. However, as the General Assembly never expressly granted the Commission the authority to issue such a regulation, it may only be upheld if it "is reasonable and 'genuinely tracks the meaning of the underlying statute.' " *Bailey v. Zoning Bd. of Adjustment of City of Philadelphia*, 569 Pa. 147, 801 A.2d 492, 501 (2001) (quoting *Borough of Pottstown v. Pennsylvania Mun. Retirement Bd.*, 551 Pa. 605, 712 A.2d 741, 743 (1998)); *see also* 66 Pa.C.S. § 1504 (granting the Commission the authority to establish regulations with respect to service and facilities). Accordingly, based on our holding that the Code does not give the Fiscal Office the authority to assess EGSs as public utilities pursuant to section 510, it is clear that 52 Pa.Code § 54.38 is invalid.

utilities pursuant to section 102 of the Code for the limited purposes of sections 2809 and 2810 of the Code and as there is nothing in those sections that even implies that EGSs may be considered public utilities for purposes of section 904–A.1 of the Administrative Code and section 399.46 of the Small Business Advocate Act, *see* 66 Pa.C.S. §§ 2809, 2810, the Fiscal Office may not treat EGSs as public utilities for purposes of the assessment provisions in section 904–A.1 of the Administrative Code and section 399.46 of the Small Business Advocate Act.

In sum, we conclude that based on the plain language of the statutes at issue, the General Assembly must not have intended EGSs to be treated as public utilities for purposes of section 510 of the Code, section 904–A.1 of the Administrative Code, and section 399.46 of the Small Business Advocate Act.[26] The Commonwealth Court's order is thereby reversed.

---

**26.** As we conclude that the plain language of the statutes at issue do not give the Fiscal Office the authority to assess EGSs as public utilities, we need not reach PPL's and Conectiv's argument that the Fiscal Office's interpretation of section 2809(e) unconstitutionally grants it unfettered authority. *See Wertz v. Chapman Twp.*, 559 Pa. 630, 741 A.2d 1272, 1273 (1999) (courts should avoid constitutional issues when the issue at hand may be decided upon other grounds).